1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SALVADOR DOMINGUEZ, JR.,      ) Case No. EDCV 12-0301-JPR
                             )
               Plaintiff,    )
                             )
          vs.                ) MEMORANDUM OPINION AND ORDER
                             ) AFFIRMING THE COMMISSIONER
                             )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social       )
Security,[1]                 )
                             )
               Defendant.    )
                             )

I.    PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB") and Supplemental Security Income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).
This matter is before the Court on the parties' Joint
Stipulation, filed October 22, 2012, which the Court has taken
under submission without oral argument.  For the reasons stated

---

     [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

below, the Commissioner's decision is affirmed and this action is dismissed.

## II.  BACKGROUND

Plaintiff was born on February 21, 1968.  (Administrative Record ("AR") 211.)  He has a high-school education.  (Id.)  Plaintiff previously worked as a collection supervisor at a collection agency and as a self-employed collector and server of delinquency letters.  (AR 212-13.)

On November 14, 2007, Plaintiff filed an application for DIB, and on December 5, 2007, he filed an application for SSI. (AR 22, 277-79, 281-85.)  Plaintiff alleged that he had been unable to work since October 5, 2007, because of a stroke, recurring transient ischemic attacks ("TIA"), depression, and fibromyalgia, among other things.[2]  (AR 277, 281, 335, 345, 387.)

After Plaintiff's applications were denied, he requested a hearing before an ALJ.  (AR 236-40, 245-49, 251.)  A hearing was held on September 23, 2009, at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE").  (AR 208-31.)  The ALJ, however, determined that the record was not complete and postponed the case.  (AR 230.)  A supplemental hearing was held on January 20,

---

[2]    A TIA occurs when blood flow to a part of the brain stops for a brief period of time.  Transient ischemic attack, PubMed Health, U.S. Nat'l Library of Medicine (May 21, 2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001743/.  A person who suffers a TIA "will have stroke-like symptoms for up to 24 hours, but in most cases for 1 - 2 hours."  Id.  After a TIA, the blockage breaks up quickly and dissolves; unlike a stroke, it does not cause brain tissue to die.  Id.  A TIA may be a "warning sign" of a coming stroke and is considered a "medical emergency." Id.

1    2010, at which Plaintiff, who was still represented by counsel,

2    appeared and testified, as did a different VE and medical expert

3    Dr. Arnold Ostrow.  (AR 173-207.)  In a written decision issued

4    on April 1, 2010, the ALJ determined that Plaintiff was not

5    disabled.  (AR 22-32.)  On January 4, 2012, the Appeals Council

6    denied Plaintiff's request for review.  (AR 1-5.)  This action

7    followed.

8    **III. STANDARD OF REVIEW**

9         Pursuant to 42 U.S.C. § 405(g), a district court may review

10   the Commissioner's decision to deny benefits.  The ALJ's findings

11   and decision should be upheld if they are free of legal error and

12   supported by substantial evidence based on the record as a whole.

13   § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

14   1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d

15   742, 746 (9th Cir. 2007).  Substantial evidence means such

16   evidence as a reasonable person might accept as adequate to

17   support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter

18   v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

19   a scintilla but less than a preponderance.  Lingenfelter, 504

20   F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,

21   882 (9th Cir. 2006)).  To determine whether substantial evidence

22   supports a finding, the reviewing court "must review the

23   administrative record as a whole, weighing both the evidence that

24   supports and the evidence that detracts from the Commissioner's

25   conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

26   1996).  "If the evidence can reasonably support either affirming

27   or reversing," the reviewing court "may not substitute its

28   judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively

presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis.  §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since October 5, 2007.  (AR 24.) At step two, the ALJ concluded that Plaintiff had the severe impairments of "status post 1991 cervical spinal fracture," "status post posterior lumbar spinal fusion," morbid obesity,

_____

     [3]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

obstructive sleep apnea, "history of [TIAs]," and psoriasis.  (AR 24-26.)  He concluded that Plaintiff's "renal failure/sepsis," diabetes mellitus, TIAs, depression, fibromyalgia, and hypertension were nonsevere.  (Id.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 26.)  At step four, the ALJ found that Plaintiff retained the RFC to perform "sedentary work" with certain additional limitations.  (Id.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could perform his past work as a collector at a collection agency as it was generally performed.  (AR 30-31.)  Alternatively, at step five, the ALJ concluded that Plaintiff was not disabled under the framework of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and that jobs existed in significant numbers in the national economy that Plaintiff could perform.  (AR 31-32.)  Accordingly, the ALJ determined that Plaintiff was not disabled.  (AR 32.)

**V.   RELEVANT FACTS**

On October 5, 2007, Plaintiff was seen in the emergency room for complaints of weakness and chest pain.  (AR 422.)  At discharge, Plaintiff was noted to be ambulating without assistance.  (AR 424.)  On October 19, 2007, Plaintiff was again seen in the emergency room and was noted to be suffering from nonischemic chest pain and anxiety.  (AR 415.)

On January 14, 2008, Plaintiff was admitted to the hospital for complaints of right-side weakness and slurred speech, both of which had been going on "for quite a long time."  (AR 618, 620-21.)  Plaintiff also complained of back pain and was noted on

1   admission to have high blood pressure.  (AR 618.)  A brain MRI,

2   brain MR angiogram, and cervical-spine CT scan were normal, but a

3   lumbar-spine CT scan showed bilateral L5 spondylolysis.  (AR 132,

4   460-61, 639-40.)  Dr. Chenna Reddy Mallu diagnosed "possible

5   transient ischemic attack," "slurred speech which is

6   longstanding," "[r]ight-sided weakness which is longstanding,"

7   and back pain.[4]  (AR 618.)  Plaintiff was discharged after an

8   overnight stay.  (AR 618-19.)  On January 25, 2008, Dr. Reddy

9   noted that Plaintiff had chronic back pain, obesity,

10  hypertension, elevated triglycerides, and a two-year history of

11  slow speech.  (AR 531.)

12      On February 24, 2008, Dr. Reddy noted that Plaintiff had

13  slow speech and sent him to the emergency room.  (AR 530.)

14  Plaintiff was admitted to the hospital with slurred speech and

15  right-leg weakness.  (AR 436, 441-42, 448-49.)  He was noted to

16  have a history of hypertension, hyperlipidemia, morbid obesity,

17  possible sleep apnea, and hypertriglyceridemia.  (AR 441.)  A

18  brain MRI, cerebral MR angiogram, and cervical-spine MRI were

19  normal.  (AR 131, 459, 463-64.)  On February 25, 2008, Dr. Bhupat

20  H. Desai performed a neurology consultation, noting that

21  Plaintiff reported developing right-side weakness and numbness

22  and abnormal and stuttering speech after October 2007, had

23  dizziness, and had started using a cane.  (AR 444.)  Dr. Desai

24  noted that Plaintiff had "mild drift of extended right arm,"

25

26      [4]   Notes in the record variously refer to a doctor named
    Mallu C. Reddy (see, e.g., AR 531), Chenna Reddy Mallu (see,
27  e.g., AR 605), and Chenna R. Mallu (see, e.g., AR 618).  Because
    these names all appear to refer to the same doctor, the Court
28  refers to him uniformly as "Dr. Reddy."

"moderate weakness" in right-lower extremity, reduced "[r]apid alternating movements on the right side," and "slightly brisk" deep tendon reflexes.  (AR 445.)  Dr. Desai concluded that Plaintiff's "history and findings" were "consistent with acute ischemic stroke, possibly brain stem with residual neurological deficit."  (AR 444-46.)

On February 26, 2008, Dr. Reddy noted that MRIs of Plaintiff's brain and cervical spine were negative and a lumbar puncture was "essentially negative" except for elevated protein. (AR 436, 605.)  Dr. Reddy's discharge diagnoses were "[p]ossible cerebrovascular accident in the brainstem with residual neurological defects," morbid obesity, hyperlipidemia, hypertension, and metabolic syndrome.  (AR 436.)

On February 29, 2008, Dr. Sarah L. Maze examined Plaintiff at the Social Security Administration's request.  (AR 467-70.) She noted that Plaintiff had weakness in the right side of his body, was forgetful, and had "poor balance" in his hands.  (AR 467.)  Dr. Maze observed that Plaintiff had a "very bizarre speech pattern at times speaking in a normal matter and at times speaking with a stutter that is not consistent," "chang[ing] from word to word," and that Plaintiff's speech pattern improved "considerably" when he was distracted.  (AR 468.)  She also noted that Plaintiff's language could be understood.  (Id.)  She found that Plaintiff had normal intelligence, intact sensation, and decreased reflexes on the left.  (AR 468-69.)  Plaintiff's motor function was 5/5 throughout except for finger abduction on the right, which was "5-/5."  (Id.)  His grip strength was 35/35/35 on the right and 95/95/95 on the left.  (AR 469.)  He brought a

1  walker to the examination but left it outside and walked to a
2  chair in the examination room.  (Id.)  She noted that Plaintiff
3  was able to walk independently.  (Id.)

4      Dr. Maze concluded that Plaintiff had "an unusual speech
5  pattern not resembling dysarthria or aphasia" and "reflex
6  asymmetry suggesting that there was a small cerebral event."  (AR
7  469.)  She believed that there was a "component of non-organic
8  overlay in the clinical presentation."[5]  (Id.)  Dr. Maze
9  diagnosed "[h]istory of stroke" and opined that Plaintiff could
10 lift 20 pounds occasionally and 10 pounds frequently, stand and
11 walk for two hours in an eight-hour day, and perform fine motor
12 activities with his arms and legs.  (AR 470.)

13     On March 10, 2008, Dr. Reddy noted that Plaintiff had a
14 history of "CVA," or cerebro-vascular accident, see Luis R.
15 DeSousa et al., Common Medical Abbreviations 58 (1995), and
16 complained of stuttering speech (AR 158).  Dr. Reddy noted that
17 Plaintiff had diet-controlled diabetes and referred him to Dr.
18 Ali Mesiwala, at the Southern California Center for Neuroscience
19 and Spine, for treatment of disc prolapse, and to neurology and
20 physical therapy.  (Id.)

21     On March 25, 2008, state-agency consultant Dr. Franklin
22 Kalmar reviewed the medical evidence in Plaintiff's file and
23 completed a Physical Residual Functional Capacity Assessment.
24 (AR 471-77.)  Dr. Kalmar opined that Plaintiff could lift and
25 carry 20 pounds occasionally and 10 pounds frequently, stand or
26 walk for at least two hours in an eight-hour day, sit for about

27
28      [5]   Overlay is "[a]n addition to an already existing
   condition."  Stedman's Medical Dictionary 1290 (27th ed. 2000).

9

1  six hours in an eight-hour day, and perform unlimited pushing and
2  pulling.  (AR 472.)  He could never climb ladders, ropes, or
3  scaffolds, but he could occasionally climb ramps and stairs,
4  balance, stoop, kneel, crouch, and crawl.  (AR 473.)  Plaintiff
5  also needed to avoid concentrated exposure to extreme heat and
6  cold, vibration, and hazards.  (AR 474.)

7       On April 17, 2008, a CT of Plaintiff's head was normal.  (AR
8  130.)  On April 29, 2008, Dr. Reddy noted that Plaintiff
9  complained of right-side weakness and slow speech that had been
10 going on for four months.  (AR 157.)  Dr. Reddy's assessment was
11 "brain stem CVA," diet-controlled diabetes, elevated lipids,
12 hypertension, and "? OSA," or questionable obstructive sleep
13 apnea.[6]  (Id.)

14      On May 13, 2008, Dr. Mesiwala noted that Plaintiff
15 complained of neck and low-back pain radiating into both legs,
16 with associated numbness and tingling.  (AR 110.)  Dr. Mesiwala
17 examined Plaintiff and found that he had "slow and broken" speech
18 but intact memory.  (Id.)  Plaintiff had 4+/5 strength diffusely
19 on the right side and 5/5 strength on the left.  (Id.)  His
20 sensation on the right side was decreased to light touch and
21 pinprick.  (Id.)  He had no evidence of cerebellar dysfunction,
22 his gait was slow, and he used a cane.  (AR 110-11.)  Plaintiff's
23 reflexes were 1+ on the left and absent on the right.  (AR 111.)
24 Dr. Mesiwala noted that a CT of Plaintiff's spine showed L5
25 spondylolysis that "may be causing low back pain and

26

27      [6]    OSA is a common medical abbreviation for obstructive
28 sleep apnea.  DeSousa, supra, at 165.  The symbol "?" indicates
   "doubtful" or "questionable."   Id. at 257.

radiculopathy," whereas Plaintiff's neck and right-hemisphere abnormalities were likely a result of his stroke.  (<u>Id.</u>)  Dr. Mesiwala ordered a lumbar-spine MRI.  (<u>Id.</u>)

On June 23, 2008, state-agency consultant Dr. Leonore C. Limos affirmed Dr. Kalmar's March 2008 RFC.  (AR 484.)  On July 7, 2008, Dr. Reddy noted that Plaintiff suffered from fibromyalgia, obesity, depression, and elevated lipids.  (AR 156.)  On August 12, 2008, Dr. Mesiwala noted that an MRI of Plaintiff's lumbar spine showed an L5 pars defect with resultant L5-S1 facet degeneration and hypertrophy, which caused "moderate to severe bilateral L5-S1 foraminal stenosis."  (AR 108, 125-26.) Dr. Mesiwala recommended "an operation in which [Plaintiff's] L5 posterior elements are removed, his spinal nerves are decompressed, and he has a fusion."  (<u>Id.</u>)

In an undated note that appears to have been faxed to the Social Security Administration on August 19, 2008, Dr. Reddy stated that Plaintiff had a history of stroke and suffered from fibromyalgia, "spine disk prolapsed," diabetes, and depression. (AR 500.)  Dr. Reddy opined that because of Plaintiff's "health condition he is not able to work."  (<u>Id.</u>)  On September 5, 2008, Dr. Reddy wrote a note "to whom it may concern," stating that Plaintiff had "multiple medical problems" and was "permanently disabled."[7]  (AR 154.)

On September 8, 2008, Dr. Mesiwala performed the recommended

---

[7]    The ALJ and the parties referred to this note as being dated April 5, 2008 (AR 27-28; J. Stip. at 5, 14), but the best of several copies in the record clearly reflects a date of "9-5-08" (<u>compare</u> AR 154 <u>with</u> AR 537).

surgery on Plaintiff's lumbar spine.  (AR 133-36.)  On September 10, 2008, a physical therapist noted that Plaintiff had been walking with a cane and that his physical-therapy goals included ambulating 50 feet with a front-wheeled walker within one week and 150 feet within two weeks.  (AR 802-03.)  On September 12, 2008, x-rays showed L5-S1 posterior fusion.  (AR 123, 577.)  Dr. Mesiwala noted that Plaintiff had made an "uneventful" recovery and discharged him from the hospital.  (AR 141.)  Dr. Mesiwala instructed Plaintiff to participate in activities as tolerated but to wear a brace when out of bed.  (<u>Id.</u>)  That same day, a front-wheeled walker was delivered to Plaintiff.  (AR 731.)

On September 25, 2008, Dr. Mesiwala wrote a letter to the Social Security Administration, stating that Plaintiff had undergone "major spine surgery" in September 2008 and would "likely be unable to work for approximately three months."  (AR 678.)  Dr. Mesiwala believed that as a result of the surgery, Plaintiff would likely have "a 90% improvement" in pain and tingling in his legs but noted that there was "no guarantee" that Plaintiff's low-back pain would be relieved.  (<u>Id.</u>)

On October 7, 2008, Plaintiff was admitted to the hospital for treatment of an infection of his surgical wound.  (AR 137-39, 647-48, 653-54, 657-58, 663-64.)  Dr. Luong Thanh Ly performed an infectious-disease consultation and found that Plaintiff had an infection of his surgery site; psoriasis; "[c]erebrovascular accident weakness of the extremities, chronic and stable"; and hypercholesterolemia.  (AR 658.)  Plaintiff was treated with intravenous antibiotics.  (AR 647, 658.)  On October 8, 2008, Dr. Mesiwala noted that Plaintiff had "fluent" speech and intact

1  memory and that he was feeling "much better" since starting
2  antibiotics.  (AR 137-39.)  Dr. Mesiwala noted that Plaintiff had
3  "no new neurologic deficits, in terms of lower extremity strength
4  and sensation."  (AR 138.)  On October 10, 2008, Dr. Reddy noted
5  that Plaintiff's infection was under control, and he was
6  discharged from the hospital.  (AR 647.)

7        On October 14, 2008, Dr. Reddy wrote a letter to the Social
8  Security Administration, stating that Plaintiff had suffered a
9  "TIA stroke" on October 5, 2007, had been diagnosed with
10 fibromyalgia and hypertension, and was "[c]linically
11 [d]epressed."  (AR 502.)  Dr. Reddy stated that Plaintiff
12 experienced "minor TIA strokes constantly, which causes the left
13 side of his head to swell instantly, it becomes very warm to the
14 touch and the body shakes in controllably [sic] for several
15 minutes."  (Id.)  He stated that Plaintiff "has been determined
16 to be permanently disabled due these [sic] conditions."  (Id.)
17 Dr. Reddy stated that Plaintiff "cannot be restored to health"
18 and "will experience discomfort, pain and always have the fear
19 that he will have a major or a series of major TIA Strokes."  (AR
20 503.)  Dr. Reddy noted that Plaintiff had undergone spinal
21 surgery in September 2008, which limited his ability to "perform
22 daily activities, such as sitting or standing for long periods of
23 time," and his "range to bend, to lift heavy objects or twist
24 [was] very limited."  (Id.)

25       On October 15, 2008, Dr. Reddy noted that Plaintiff reported
26 experiencing mood swings.  (AR 153.)  On January 8, 2009, Dr.
27 Reddy noted that Plaintiff had obesity, obstructive sleep apnea,
28 and hypertension.  (AR 152.)

1    On March 3, 2009, Dr. Reddy noted that Plaintiff weighed 304
2  pounds and suffered from obesity, "SZ," or seizure, see DeSousa,
3  supra, at 218, and hypertension.  (AR 151.)  In April 2009, Dr.
4  Reddy noted that Plaintiff weighed 306 pounds and suffered from
5  obesity, chronic back pain, hypertension, and "? SZ," presumably,
6  questionable seizure.  (AR 150.)

7    On May 5, 2009, in a note cosigned by Dr. Mesiwala,
8  physician's assistant John DeVere assessed Plaintiff as having
9  "[s]tatus post posterior lumbar spinal fusion due to spondylotic
10 spondylolisthesis at L5-S1" and noted that x-rays showed good
11 positioning of the hardware.  (AR 755.)  Physical examination
12 revealed that Plaintiff was "severely, grossly obese."  (Id.)
13 Plaintiff was having ongoing back and left-leg pain and had
14 restricted range of motion of the lumbar spine and difficulty
15 twisting and turning "because of pain and because of [his] size."
16 (Id.)  Plaintiff, however, was ambulating "without difficulty"
17 and had a negative straight-leg raise, "5/5 strength," and
18 grossly intact sensation and motor function.  (Id.)  DeVere noted
19 that they would continue monitoring Plaintiff and had encouraged
20 him to lose weight or undergo a procedure like lap-band or
21 gastric-bypass surgery.  (Id.)

22    In another note that was also dated May 5, 2009, and
23 cosigned by Dr. Mesiwala, DeVere noted that "the excessive weight
24 that [Plaintiff] has been gaining and the amount of weight that
25 he has at this point in time is hindering his recovery and
26 increasing the potential probability of not healing as well."
27 (AR 103, 730.)  They were "quite concerned" because Plaintiff's
28 bone did not appear to be "completely fused," and he "may later

                              14

this year need further studies to verify the osseous fusion has occurred."  (Id.)  If not, and if pain continued to be "a pressing issue," then they "may be considering anterior lumbar interbody at L5-S1."  (Id.)  DeVere noted that they hoped to avoid that surgery, however, by having Plaintiff "go through a procedure such as lap band or gastric bypass surgery in which he can reduce his weight."  (Id.)  He concluded that Plaintiff's weight was "causing increasing pressure and we are concerned about possible non-union at this time."  (Id.)

On May 6, 2009, Dr. Reddy completed a Functional Capacity Questionnaire, stating that he had been treating Plaintiff since January 2008.  (AR 549.)  He listed Plaintiff's diagnoses as "CVA," obesity, chronic back pain, hypertension, and depression. (Id.)  Dr. Reddy listed Plaintiff's symptoms as "depression" and "muscle weakness."  (Id.)  He did not check the box that indicated that Plaintiff had been "prescribed [a] cane or other walking device."  (Id.)  Dr. Reddy opined that Plaintiff could "rarely" lift and carry less than 10 pounds and never more than that; his pain would "frequently" interfere with the attention and concentration needed to perform even simple work tasks; and he would miss more than four days of work a month because of his impairments or medical treatment.  (Id.)  Dr. Reddy believed that Plaintiff was unable to work in any occupation.  (Id.)

On May 22, 2009, Dr. Gisella V. Olivares noted that Plaintiff's complaints included a history of "prior stroke" and high blood pressure, back problems and a possible need for another back surgery, and fibromyalgia.  (AR 727.)  Under "assessment," Dr. Olivares listed benign essential hypertension,

1   transient cerebral ischemia, and "myalgia and myositis
2   unspecified." (Id.)

3       On June 29, 2009, Dr. Olivares noted that Plaintiff thought
4   that he had been having seizures and wanted disability forms
5   filled out. (AR 725.) Her assessment was diabetes mellitus
6   without complication, "myalgia and myositis unspecified," and
7   "localization-related epilepsy and epileptic syndromes with
8   simple partial seizures." (Id.) She noted that Plaintiff needed
9   authorization for a neurologist, started him on glucophage for
10  his diabetes, and filled out his disability forms. (Id.)

11      On July 9, 2009, Dr. Olivares completed a Medical Source
12  Statement Concerning the Nature and Severity of an Individual's
13  Impairments Results from a Stroke. (AR 543-48.) Dr. Olivares
14  stated that Plaintiff had had a stroke and that he suffered from
15  loss of manual dexterity, weakness, unstable walking, falling
16  spells, numbness or tingling, pain, fatigue, bladder problems,
17  vertigo or dizziness, headaches, difficulty remembering,
18  confusion, depression, emotional lability, personality change,
19  blurred vision, and a shaking tremor. (AR 543.) She indicated
20  that Plaintiff had "significant and persistent disorganization of
21  motor function in two extremities resulting in sustained
22  disturbance of gross and dexterous movement or gait and station."
23  (AR 544.) She believed that emotional factors contributed to the
24  severity of Plaintiff's symptoms and functional limitations, his
25  impairments were reasonably consistent with his symptoms and
26  limitations, and his pain and other symptoms constantly
27  interfered with his attention and concentration. (Id.) She
28  opined that Plaintiff could walk one block before resting, sit

for 15 minutes before having to get up, stand for 15 minutes before needing to move or sit down, and stand and walk for a total of less than two hours in an eight-hour day.  (AR 544-45.) She believed Plaintiff would need to take unscheduled 15-minute breaks every 15 minutes of an eight-hour workday and that Plaintiff's legs should be elevated 30 degrees for 75% of an eight-hour sedentary workday.  (AR 545-46.)  Dr. Olivares stated that Plaintiff needed to use a cane or assistive device for occasional standing and walking; could "never" lift 10 pounds or less; could never twist, stoop, crouch, or climb ladders or stairs; and had "significant" limitations in reaching, handling, and fingering.  (Id.)  When asked to what degree Plaintiff could tolerate work stress, Dr. Olivares indicated that Plaintiff was capable of "low stress jobs."  (AR 547.)  She stated that Plaintiff would be absent from work more than four days a month as a result of his impairments or treatment.  (AR 548.)  She stated that "2007" was the earliest date that her description of Plaintiff's symptoms and limitations applied.  (Id.)

On August 17, 2009, an x-ray of Plaintiff's lumbar spine showed "[s]atisfactory post-op appearance."  (AR 724.)  On August 18, 2009, physician's assistant DeVere noted that the x-rays showed "good positioning of hardware" but that they were "unable to tell if [Plaintiff] had osseous fusion."  (AR 887.)  DeVere noted that Plaintiff reported that he "feels well and has no pain."  (Id.)  Upon exam, Plaintiff had restricted range of motion of the lumbar spine, his sensation and motor function were grossly intact, and he had no gross motor or neurologic deficit. (Id.)  DeVere noted that they would follow up with x-rays in

1  three months.  (Id.)

2      On October 14, 2009, Dr. Olivares noted that Plaintiff
3  reported that his blood sugar remained high, he had an infection
4  on the side of his abdomen, and he was "still with numbness to
5  hands and feet and unable to work." (AR 861.)  Her assessment
6  was "diabetes mellitus without complication" and "cellulitis and
7  abscess of the trunk." (Id.)

8      On November 14, 2009, Plaintiff was admitted to the hospital
9  for acute renal failure. (AR 843-60.)  That day, a CT of his
10 head showed no acute intracranial disease. (AR 839.)  Plaintiff
11 was noted to have sepsis, possible fluid volume depletion, and
12 possible influenza or viral syndrome, among other things; he was
13 admitted for treatment. (AR 850-51.)  The record does not appear
14 to reflect when Plaintiff was discharged.

15     On November 24, 2009, in a note that appeared to have been
16 initialed by physician's assistant DeVere, Plaintiff was noted to
17 have pain with range of movement and a negative straight-leg
18 raise. (AR 886.)  On January 19, 2010, Dr. Olivares completed a
19 Medical Source Statement Concerning the Nature and Severity of an
20 Individual's Physical Impairment. (AR 935-41.)  She stated that
21 she had been treating Plaintiff "as needed/monthly" since May 22,
22 2009. (AR 935.)  She noted that Plaintiff had "localized
23 epilepsy," transient cerebral ischemia, and fibromyalgia, and she
24 estimated Plaintiff's pain to be eight out of 10 and his fatigue
25 to be nine out of 10. (Id.)  Dr. Olivares believed that
26 Plaintiff could sit for zero to two hours in an eight-hour day,
27 stand or walk for zero to two hours in an eight-hour day, and
28 never lift or carry 10 pounds or more. (AR 936.)  Plaintiff had

18

"significant limitations" in doing repetitive reaching, handling,
fingering, and lifting, and he needed to use an assistive device
for occasional standing or walking.  (Id.)  Dr. Olivares stated
that Plaintiff was incapable of tolerating even "low stress" but
had no "emotional factors" that contributed to the severity of
his symptoms and functional limitations.  (AR 937.)  She
indicated that Plaintiff had "limited vision"; needed to avoid
noise, temperature extremes, humidity, dust, and heights; and
could not stoop, push, kneel, pull, or bend.  (Id.)  Finally, Dr.
Olivares noted that Plaintiff would be absent from work about two
or three times a month as a result of his impairments or
treatment.  (AR 938.)

     At the January 20, 2010 hearing before the ALJ, Dr. Ostrow,
a board-certified internist, testified that Plaintiff's medically
determinable impairments included "status post spinal fracture in
1991" with subsequent fusion surgery, anxiety, morbid obesity,
obstructive sleep apnea, possible ischemic strokes, diabetes
mellitus, bilateral L5 radiculopathy, and psoriasis.  (AR 178.)
Dr. Ostrow also noted that Plaintiff had been diagnosed with
fibromyalgia, which he believed was "not well documented or
substantiated and in light of [Plaintiff's] other underlying
medical problems" was probably incorrect.  (Id.)  Dr. Ostrow
opined that Plaintiff could lift 20 pounds occasionally and 10
pounds repetitively, stand or walk for two hours in an eight-hour
day, and sit for six hours in an eight-hour day.  (AR 179.)
Plaintiff was unable to use his upper extremities above shoulder
height, could only occasionally turn his head, could use his
lower extremities as "guides only," and could not use foot

pedals.  (AR 179-81.)  Dr. Ostrow opined that Plaintiff could occasionally bend, stoop, or climb stairs but could not climb ropes, ladders, or scaffolding or work at unprotected heights. (AR 179.)

On January 22, 2010, Dr. Olivares noted that Plaintiff weighed 290 pounds and had reported that his blood sugar was "running much better since taking medication for diabetes" but that he had gained weight since his weight-loss supplement had been denied; he still complained of "numbness to hands and feet," "all over body pain," and an inability to "sit or stand for a long period of time."  (AR 891.)  Plaintiff reported that he had been evaluated by a neurosurgeon to "have a device inserted into his back for better pain control instead of regular back surgery."  (Id.)  Plaintiff also reported that he was "awaiting decision" by Social Security.  (Id.)  Dr. Olivares's assessment was diabetes mellitus without complication, benign essential hypertension, "myalgia and myositis unspecified," and lumbago. (Id.)

In an Assistive Device Medical Source Statement with an illegible date, Dr. Mesiwala stated that Plaintiff intermittently required a cane for standing and walking, and he recommended that Plaintiff continue using his cane "as needed" with "extended" walking.  (AR 934.)  Dr. Mesiwala stated that the earliest date Plaintiff had required use of an assistive device for standing and walking was his "surgery date" of September 8, 2008.  (Id.)

In his April 2, 2010 decision, the ALJ determined that

1  Plaintiff retained the RFC to perform "sedentary work."[8]  (AR
2  26.)  Specifically, he could

3      lift and carry 20 pounds occasionally and 10 pounds
4      frequently; sit 6 hours in an 8 hour day; stand/walk 2
5      hours in an 8 hour day; occasionally climb stairs, bend,
6      and stoop but avoid climbing of ropes, ladders, or
7      scaffolds; avoid use of upper extremities above shoulder
8      height; avoid use of foot pedals and use lower
9      extremities as guides only; avoid unprotected heights;
10     and occasionally move his neck.

11 (Id.)  In so finding, the ALJ relied on the opinion of Dr.
12 Ostrow, who, the ALJ noted, was a board-certified internist and
13 had "had an opportunity to review the entire medical records and
14 hear" Plaintiff's testimony.  (AR 24-25.)  The ALJ also
15 "generally accepted" the opinions of examining physician Maze and
16 consulting physician Kalmar "to the extent they [were] consistent
17 with the opinions of Dr. Ostrow" because they were "not
18 inconsistent with the medical evidence as a whole."  (AR 29.)

19     The ALJ gave "less weight" to Dr. Reddy's opinions because
20 "the issue of disability is reserved to the Commissioner" and
21 because Dr. Reddy's opinions were not "well supported by the
22 entire medical evidence."  (AR 28.)  The ALJ also gave "less

---

24     [8]    "Sedentary work" involves "lifting no more than 10
25 pounds at a time and occasionally lifting or carrying articles
   like docket files, ledgers, and small tools."   20 C.F.R.
26 §§ 404.1567(a), 416.967(a).  "Although a sedentary job is defined
   as one which involves sitting, a certain amount of walking and
27 standing is often necessary in carrying out job duties."  Id.
   Thus, "[j]obs are sedentary if walking and standing are required
28 occasionally and other sedentary criteria are met."  Id.

21

weight" to Dr. Mesiwala's opinions because they were not

"entirely consistent" with his treatment notes.  (Id.)  Finally,

the ALJ gave "little weight" to Dr. Olivares's opinions because

she had seen Plaintiff only a few times when she rendered them

and because they were "inherently inconsistent" and unsupported

by the medical records.  (AR 29.)

**VI.  DISCUSSION**

     Plaintiff alleges that the ALJ erred in failing to properly

assess (1) the "relevant medical evidence of record including

treating physician opinions" and (2) Plaintiff's subjective

complaints and credibility.  (J. Stip. at 3-4.)

     A.   The ALJ Properly Evaluated the Medical Evidence

     Plaintiff contends that the ALJ failed to properly consider

the opinions of treating physicians Drs. Olivares, Reddy, and

Mesiwala.  (J. Stip. at 4-10.)  Plaintiff further argues that the

ALJ erred by failing to consider Plaintiff's "need to use a cane"

when assessing his RFC.  (J. Stip. at 10-12.)  Finally, Plaintiff

argues that the ALJ should have found the opinion of examining

physician Dr. Maze to be "invalid and of no weight whatsoever"

because she rendered her opinion before Plaintiff underwent

lumbar spine surgery.  (J. Stip. at 12-13.)

     Three types of physicians may offer opinions in social

security cases: "(1) those who treat[ed] the claimant (treating

physicians); (2) those who examine[d] but d[id] not treat the

claimant (examining physicians); and (3) those who neither

examine[d] nor treat[ed] the claimant (non-examining

physicians)."  Lester, 81 F.3d at 830.  A treating physician's

opinion is generally entitled to more weight than the opinion of

22

a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician. Id.

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. 20 C.F.R. §§ 404.1527(c)(3)-(6); 416.927(c)(3)-(6).

When a treating doctor's opinion is not contradicted by another doctor's, it may be rejected only for "clear and convincing" reasons. See Lester, 81 F.3d at 830. When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). Indeed, the ALJ may discredit treating-doctor opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical

23

1   findings.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d

2   1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957

3   (9th Cir. 2002).

4        1.   Dr. Olivares's opinion

5        Contrary to Plaintiff's contentions (J. Stip. at 10), the

6   ALJ provided specific and legitimate reasons for according

7   "little weight" to Dr. Olivares's controverted opinions.  The ALJ

8   correctly noted that Dr. Olivares completed the July 2009 Medical

9   Source Statement after seeing Plaintiff only twice — in May and

10  June 2009 — and she completed the January 2010 Medical Source

11  Statement after seeing Plaintiff only one additional time — in

12  October 2009.  (AR 29, 725-727, 861.)  The ALJ was entitled to

13  consider the length of treatment and frequency of examination in

14  assessing the doctor's opinion.  20 C.F.R. §§ 404.1527(c)(2)(i),

15  416.927(c)(2)(i); Edlund v. Massanari, 253 F.3d 1152, 1157 (9th

16  Cir.) (as amended Aug. 9, 2001).

17       The ALJ also reasonably accorded less weight to Dr.

18  Olivares's opinions because her treatment notes "merely noted

19  [Plaintiff's] past medical history with minimal physical

20  examinations."  (AR 29.)  Indeed, Dr. Olivares made very few

21  findings during the two or three visits that predated her

22  disability opinions.  In May 2009, Dr. Olivares noted only

23  Plaintiff's medical history and complaints of toe fungus and

24  briefly summarized an apparently normal physical exam.  (AR 727.)

25  In June 2009, Dr. Olivares completed Plaintiff's disability

26  forms, conducted a urinalysis to see if he had a urinary tract

27  infection, briefly summarized another apparently normal physical

28  exam, and prescribed diabetes medication.  (AR 725-26.)  Dr.

Olivares noted that Plaintiff thought he was having seizures but recorded no observations or clinical findings about them and stated only that he needed authorization for a neurologist. (AR 725.) In October 2009, Dr. Olivares noted that Plaintiff reported high blood sugar, improved urination, a healing infection on the side of his abdomen, and "numbness to hands and feet." (AR 861.) She tested Plaintiff's blood sugar and wound and prescribed additional diabetes medications. (Id.) With the exception of Plaintiff's wound, a physical exam appeared to be normal. (Id.) Those brief, routine notes fail to support Dr. Olivares's finding that Plaintiff suffered from significant functional limitations and was unable to work. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion); Batson, 359 F.3d at 1195 ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports).

The ALJ also correctly found that Dr. Olivares's July 2009 and January 2010 opinions were "inherently inconsistent." (AR

29.)  For example, in July 2009, Dr. Olivares opined that
Plaintiff had emotional factors that contributed to his symptoms
and functional limitations.  (AR 544.)  Six months and a single
visit later, however, Dr. Olivares found that Plaintiff had no
emotional factors that contributed to his symptoms or functional
limitations.  (AR 937.)  Similarly, in July 2009, Dr. Olivares
opined that Plaintiff was capable of "low stress jobs" and would
miss more than four days of work per month (AR 547-48); in
January 2010, she opined that he was "[i]ncapable of low stress"
work but would miss only about two or three days of work per
month (AR 937-38).  Her notes do not explain or account for these
differences.  The ALJ was entitled to discount Dr. Olivares's
opinions based on those inconsistencies.  See Matney ex rel.
Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992)
("inconsistencies and ambiguities" in doctor's opinion were
specific and legitimate reasons for rejecting it); Houghton v.
Comm'r of Soc. Sec. Admin., No. 11-35623, ___ F. App'x ___, 2012
WL 3298201, at *1 (9th Cir. Aug. 14, 2012) (ALJ's finding that
doctors' opinions were "internally inconsistent, unsupported by
their own treatment records or clinical findings, [and]
inconsistent with the record as a whole" constituted specific and
legitimate bases for discounting them).

     Plaintiff summarily asserts that differences in Dr.
Olivares's July 2009 and January 2010 opinions were attributable
to the "significant amount of treatment" he underwent during the
intervening six months.  (J. Stip. at 9-10.)  As noted, however,
Dr. Olivares saw Plaintiff only once during those six months, to
treat only Plaintiff's longstanding diabetes and an abdominal

wound.  (AR 861.)  Other than Dr. Olivares, Plaintiff saw only physician's assistant DeVere during the period, who apparently examined Plaintiff without providing treatment.  (AR 886-87.) Plaintiff was also hospitalized for treatment of what appeared to be an unrelated infection or virus.  (AR 843-60.)  Contrary to Plaintiff's assertion, therefore, the record does not reflect a "significant amount of treatment" during the six months in question or account for the differences in Dr. Olivares's two opinions.

The ALJ also permissibly discounted Dr. Olivares's conclusions because the medical records did not support them. (AR 29.)  The ALJ noted that on May 5, 2009, x-rays of Plaintiff's lumbar spine showed "good positioning of the hardware and no evidence of non-union."  (AR 28, 755.)  At that time, DeVere and Dr. Mesiwala noted that they could not tell whether Plaintiff's lumbar spine was "fully fused" and that Plaintiff had back and left-leg pain and restricted range of motion of the lumbar spine, but he was nevertheless "ambulating without difficulty" and had a negative straight-leg-raising test, "5/5 strength," and grossly intact sensation and motor function.  (AR 755.)  As the ALJ also noted (AR 29), by August 2009, Plaintiff reported that he "feels well and has no pain" (AR 887).  At that time, Plaintiff's sensation and motor function were grossly intact, he had no gross motor or neurologic deficit, and x-rays of his lumbar spine showed "good positioning of the hardware." (Id.)  And although Dr. Olivares noted that Plaintiff had fibromyalgia, the ALJ reasonably concluded that that diagnosis was not "well documented" because "no physician indicated number

27

of tender trigger points to confirm the diagnosis."[9]  (AR 25.)

Dr. Maze also examined Plaintiff and found that despite the

residuals of Plaintiff's October 2007 stroke, he was still able

to lift 20 pounds occasionally and 10 pounds frequently, stand

and walk for two hours in an eight-hour day, and perform fine

motor activities.  (AR 469-70.)  Dr. Ostrow, the testifying

medical expert, reviewed Plaintiff's medical records and opined

that he retained the RFC adopted by the ALJ.  (AR 179-81.)  And

finally, contrary to Dr. Olivares's finding that Plaintiff needed

a cane for even "occasional" standing or walking (AR 546),

Plaintiff's neurosurgeon, Dr. Mesiwala, recommended that

Plaintiff use a cane only "as needed" for "extended" walking (AR

934), and his other treating physician, Dr. Reddy, did not

indicate that Plaintiff needed to use an assistive device at all

(see, e.g., AR 549).  The ALJ was therefore permitted to discount

Dr. Olivares's opinion because it was inconsistent with the

record as a whole.  See Batson, 359 F.3d at 1195 (ALJ may

discredit treating physicians' opinions that are conclusory,

brief, and unsupported by the record as a whole or by objective

medical findings); 20 C.F.R. §§ 404.1527(c)(4) ("Generally, the

---

[9]     Fibromyalgia is a "[r]heumatic syndrome of pain in
connective tissues and muscles without muscle weakness,
characterized by general body aches, multiple tender areas,
fatigue, sleep disturbances, and reduced exercise tolerance; seen
most frequently among women 20 to 50 years of age; cause is
unknown."  Ida G. Dox et al., Attorney's Illustrated Medical
Dictionary 55 (Supp. 2004).  Diagnosis is made based on
widespread pain for at least three months and pain on digital
palpation present in at least 11 of 18 specific sites on the
body.  Id.; see also SSR 12-2P, 2012 WL 3104869, at *2-3 (listing
diagnostic criteria for fibromyalgia).

more consistent an opinion is with the record as a whole, the

more weight we will give to that opinion."), 416.927(c)(4)

(same).

2.  <u>Dr. Reddy's Opinion</u>

Plaintiff argues that the ALJ "failed to cite any

significant or legitimate reasons for rejecting" treating

physician Reddy's opinions and "committed reversible error" by

failing to discuss, or even acknowledge, Dr. Reddy's May 2009

Functional Capacity Questionnaire.  (J. Stip. at 4-6.)

In August 2008, Dr. Reddy stated that Plaintiff had a

history of stroke, fibromyalgia, "spine disk prolapsed,"

diabetes, and depression and was unable to work.  (AR 500.)  In

September 2008, Dr. Reddy stated that Plaintiff had "multiple

medical problems" and was "permanently disabled."  (AR 154.)  In

October 2008, Dr. Reddy stated that Plaintiff had a history of

stroke and suffered from "constant" TIA strokes,  fibromyalgia,

hypertension, and depression.  (AR 502.)  Dr. Reddy stated that

Plaintiff had a limited ability to sit or stand for long periods

of time, lift heavy objects, bend, and twist and was "permanently

disabled."  (AR 503.)  Finally, in May 2009, Dr. Reddy completed

a Functional Capacity Questionnaire, stating that Plaintiff could

"rarely" lift and carry less than 10 pounds and never more than

that; his pain would frequently interfere with the attention and

concentration needed to perform even simple work tasks; and he

would miss more than four days of work a month because of his

impairments or medical treatment.  (AR 549.)

The ALJ summarized some of Dr. Reddy's notes and his August,

September, and October 2008 disability opinions before concluding

that "[t]he opinions of Dr. Reddy are given less weight since the
issue of disability is reserved to the Commissioner and his
opinions are not well supported by the entire medical evidence."
(AR 27-28.)   It is true that a treating physician's statement on
an issue reserved to the Commissioner, such as the determination
of a claimant's ultimate disability, is not binding on the ALJ or
entitled to special weight.   20 C.F.R. §§ 404.1527(d)(1) ("A
statement by a medical source that you are 'disabled' or 'unable
to work' does not mean that we will determine that you are
disabled."), 416.927(d)(1) (same); SSR 96-5p, 1996 WL 374183, at
*5 (treating-source opinions that a person is disabled or unable
to work "can never be entitled to controlling weight or given
special significance"); see also McLeod v. Astrue, 640 F.3d 881,
885 (9th Cir. 2011) ("A disability is an administrative
determination of how an impairment, in relation to education,
age, technological, economic, and social factors, affects ability
to engage in gainful activity.").   Thus, the ALJ was not
obligated to accept it.

     Moreover, as the ALJ found, the objective medical evidence
did not support Dr. Reddy's finding that Plaintiff's functional
limitations were so great as to preclude all work.   Indeed, the
evidence that supported the ALJ's rejection of Dr. Olivares's
opinion also supported his rejection of Dr. Reddy's opinions,
which were very similar.   (See AR 544 (Dr. Olivares's finding
that Plaintiff's pain interfered with concentration); AR 548 (Dr.
Olivares's finding that Plaintiff would miss more than four days
of work a month); AR 936 (Dr. Olivares's finding that Plaintiff
could never lift 10 pounds); AR 938 (Dr. Olivares's finding that

1  Plaintiff would miss two or three days of work a month).)

2      As Plaintiff argues (J. Stip. at 6), the ALJ failed to

3  specifically discuss Dr. Reddy's May 2009 Functional Capacity

4  Questionnaire.  The ALJ, however, was "not required to discuss

5  every piece of evidence."  <u>See</u> <u>Howard ex rel. Wolff v. Barnhart</u>,

6  341 F.3d 1006, 1012 (9th Cir. 2003).  Instead, whether the ALJ

7  was required to explain why he rejected the limitations suggested

8  by Dr. Reddy depends on whether the opinion constituted

9  "significant probative evidence."  <u>Vincent ex rel. Vincent v.</u>

10 <u>Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984); <u>accord</u> <u>Howard</u>, 341

11 F.3d at 1012; <u>Houghton</u>, 2012 WL 3298201, at *1 (citation

12 omitted).  Here, the limitations that Dr. Reddy listed in the May

13 2009 questionnaire were not significant or probative.  First,

14 much of what Dr. Reddy reported was cumulative of his October

15 2008 opinion that Plaintiff was depressed; "very limited" in his

16 ability to lift heavy objects, twist, and bend; and "permanently

17 disabled."  (AR 502.)  Second, as previously mentioned, Dr.

18 Reddy's findings were also cumulative of those in Dr. Olivares's

19 July 2009 and January 2010 opinions, which the ALJ properly

20 discounted as unsupported by the evidence as a whole.  (AR 29);

21 <u>see</u> <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755 (9th Cir. 1989) (ALJ

22 not required to recite "magic words" when rejecting evidence and

23 court may draw "specific and legitimate inferences from the ALJ's

24 opinion); <u>Mondragon v. Astrue</u>, 364 F. App'x 346, 349 (9th Cir.

25 2010) (ALJ not required to discuss doctors' specific statements

26 "when their substance was adequately represented by the evidence

27 the ALJ did discuss").

28      Moreover, Dr. Reddy's finding that Plaintiff could lift and

31

1  carry less than 10 pounds "rarely" and "never" lift 10 pounds or
2  more was consistent with the ALJ's conclusion that Plaintiff
3  could perform sedentary work, which requires only "occasional[]"
4  lifting and carrying of very lightweight items like files,
5  ledgers, and small tools and never requires lifting more than 10
6  pounds.  See 20 C.F.R. §§ 404.1567(a) (sedentary work "involves
7  lifting no more than 10 pounds at a time and occasionally lifting
8  or carrying articles like docket files, ledgers, and small
9  tools"), 416.967(a) (same).  Thus, while it may have made a
10 better record for the ALJ to have explicitly addressed Dr.
11 Reddy's May 2009 findings, he was not required to do so.
12 Plaintiff is not entitled to reversal on this ground.

13            3.  Dr. Mesiwala's opinion and Plaintiff's use of a
14                cane

15       Plaintiff argues that the ALJ erred by rejecting Dr.
16 Mesiwala's opinion that Plaintiff sometimes needed to use a cane
17 for extended walking and by failing to consider Plaintiff's use
18 of a cane when assessing his RFC.  (J. Stip. at 6-8, 10-12.)  The
19 ALJ accorded "less weight" to Dr. Mesiwala's opinions because
20 they were "not entirely consistent with his treating notes."  (AR
21 28.)  Indeed, x-rays of Plaintiff's lumbar spine in May 2009
22 showed good positioning of the hardware (AR 755), and x-rays in
23 August 2009 showed satisfactory post-op appearance (AR 724).[10]
24 In May 2009, moreover, Dr. Mesiwala noted that Plaintiff had back
25 and left-leg pain and reduced range of motion of his back but

27       [10]   The ALJ mistakenly stated that these x-rays were dated
28 March 9, 2009.  (AR 28 (citing agency exhibit 19F); AR 724
   (agency exhibit 19F, listing "date of service" as "8/17/2009").)

also found that Plaintiff was ambulating "without difficulty" and had "5/5 strength" and grossly intact sensation and motor function. (AR 755.) Those findings were consistent with Dr. Reddy's May 2009 Functional Capacity Questionnaire, on which Dr. Reddy did not check the box indicating that Plaintiff needed to use a "prescribed cane or other walking device" or had any walking or standing limitations. (AR 549.) In August 2009, physician's assistant DeVere, who worked with Dr. Mesiwala, noted that Plaintiff "feels well and has no pain" and had grossly intact sensation and motor function and no gross motor or neurologic defect. (AR 887.) Finally, in November 2009, DeVere noted that Plaintiff had pain but a negative straight-leg-raising test. (AR 886.) Those findings indicated that Plaintiff was able to walk without difficulty and had acceptable strength and motor function, in contrast to Dr. Mesiwala's finding that Plaintiff needed a cane to walk. An ALJ may reject a doctor's medical opinions that are inconsistent with the underlying treatment notes. <u>Connett</u>, 340 F.3d at 875; <u>Valentine</u>, 574 F.3d at 692-93; <u>Rollins</u>, 261 F.3d at 856.

In any event, even if the ALJ erred by rejecting Dr. Mesiwala's opinion, that error was harmless. As the ALJ noted (AR 28), the VE testified in response to the ALJ's questioning that Plaintiff could perform sedentary work even with the use of a cane, though a walker, by contrast, would preclude it:

> Q:  With regard to the hypotheticals posed if the individual needed to use a cane or walker for ambulation would that effect [sic] his ability to do the sedentary work?

1    A:    Yes, Your Honor, I believe it would.

2    Q:    How?

3    A:    . . . [O]n occasion the sedentary workers will have

4          to go retrieve materials or . . . move about to a

5          different work setting.   And if, if they're

6          required to use a walker it's going to impede their

7          ability to perform at the normal pace.   So I

8          believe they would not be able to sustain

9          competitive employment.

10    Q:    Okay, that would be a walker not a cane, is that

11          what you're saying?

12    A:    Yes.

13    Q:    Using two hands?

14    A:    Um-hum.

15    Q:    All right.   So that would impede both the past work

16          and the other work that you indicated, is that

17          right?

18    A:    Yes, Your Honor.

19 (AR 197-98.)   Contrary to Plaintiff's argument that the VE

20 "appear[ed]" to state that Plaintiff could not work if he had to

21 use a walker or a cane  (J. Stip. at 11-12), the VE in fact

22 indicated that it was the use of a walker with "two hands," not a

23 cane, that would be prohibitive (AR 197-98).[11]   Thus, Plaintiff's

24

25     [11]   Indeed, the VE's conclusion is consistent with Social
Security policy, particularly because Dr. Mesiwala believed
26 Plaintiff needed a cane only intermittently, for extended
walking.   See SSR 96-9p, 1996 WL 374185, at *7 (stating that
27 individual who uses "hand-held assistive device in one hand may
still have the ability to perform the minimal lifting and
28 carrying requirements of many sedentary unskilled occupations

asserted need for a cane would not preclude him from performing
the sedentary jobs identified by the VE and the ALJ.  Any error
in rejecting Dr. Mesiwala's opinion was therefore harmless.  See
Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir.
2006) (nonprejudicial or irrelevant mistakes harmless).

### 4.   Dr. Maze's opinion

Plaintiff also argues, with no citation to authority, that
"[t]he simple fact that Dr. Maze rendered her consultative
opinion . . . on February 29, 2008 and the Plaintiff ended up
undergoing major lumbar spine surgery on September 8, 2008 should
in and of itself render [her opinions] invalid and of no weight
whatsoever." (J. Stip. at 12.)  The ALJ, however, was obligated
to "consider all medical opinion evidence." Tommasetti v.
Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); see also 20 C.F.R.
§§ 404.1527(c) (noting that ALJ "will evaluate every medical
opinion" received using "all" of several factors, including
examining or treating relationship, supportability,
specialization, and consistency with the record as a whole),
416.927(c) (same).  Moreover, Dr. Maze's opinion postdated
Plaintiff's stroke and his alleged disability onset date of
October 5, 2007, and was therefore relevant to determining his
disability status during the time period at issue in this case.
Compare Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155,
1165 (9th Cir. 2008) ("Medical opinions that predate the alleged

---

with the other hand," and "if a medically required hand-held
assistive device is needed only for prolonged ambulation . . .
the unskilled sedentary occupational base will not ordinarily be
significantly eroded").

1  onset of disability are of limited relevance" especially when

2  "disability is allegedly caused by a discrete event").

3      Indeed, Dr. Maze's opinion was supported by independent

4  clinical findings and thus constituted substantial evidence upon

5  which the ALJ could properly rely.  See Tonapetyan v. Halter, 242

6  F.3d 1144, 1149 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d

7  1035, 1041 (9th Cir. 1995).  Dr. Maze performed physical and

8  neurological examinations, noting that Plaintiff had mostly

9  normal motor functioning, reduced grip strength on the right,

10  reduced reflexes on the left, intact sensation, and normal

11  coordination, among other things.  (AR 467-70.)  She diagnosed

12  "[h]istory of stroke" and opined that Plaintiff was limited to

13  lifting 20 pounds occasionally and 10 pounds frequently and

14  standing or walking for two hours in an eight-hour day.  (AR 469-

15  70.)  Thus, at least as to Plaintiff's limitations resulting from

16  his October 2007 stroke, the ALJ was entitled to rely on Dr.

17  Maze's opinion rather than the other physicians'.

18      Moreover, Dr. Maze's assessment may actually have been more

19  sympathetic to Plaintiff than if it had been made at a later date

20  because Plaintiff's back condition appears to have improved after

21  his lumbar-spine surgery.  For example, in September 2008, Dr.

22  Mesiwala noted that the surgery would likely result in a 90%

23  improvement in pain and tingling in Plaintiff's legs (AR 678),

24  and in May 2009, Dr. Mesiwala noted that Plaintiff was ambulating

25  without difficulty and had 5/5 strength and grossly intact

26  sensation and motor function (AR 755).  In August 2009, moreover,

27  a lumbar-spine x-ray showed satisfactory post-op appearance (AR

28  724), and DeVere noted that Plaintiff felt well, had no pain or

36

gross motor or neurologic defect, and had grossly intact
sensation and motor function (AR 887).

In any event, the ALJ accommodated the possibility that Dr.
Maze's opinion may not have encompassed Plaintiff's later
limitations by crediting it only to the extent that it was
consistent with the opinion of testifying medical expert Dr.
Ostrow. (AR 29.) The ALJ found that Dr. Ostrow's opinion was
consistent with the medical record, and Plaintiff does not
challenge that conclusion or the ALJ's reliance on Dr. Ostrow's
opinion. See Thomas, 278 F.3d at 957 ("The opinions of
non-treating or non-examining physicians may also serve as
substantial evidence when the opinions are consistent with
independent clinical findings or other evidence in the record.");
Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir.
1999) ("Opinions of a nonexamining, testifying medical advisor
may serve as substantial evidence when they are supported by
other evidence in the record and are consistent with it" (citing
Andrews, 53 F.3d at 1041)); see 20 C.F.R. §§ 404.1527(c)(4) (ALJ
will generally give more weight to opinions that are "more
consistent . . . with the record as a whole"), 416.927(c)(4)
(same). Dr. Ostrow, unlike the other doctors, reviewed all of
the medical evidence and heard Plaintiff testify before rendering
his opinion. See 20 C.F.R. §§ 404.1527(c)(3) (in weighing
medical opinions, ALJ "will evaluate the degree to which these
opinions consider all of the pertinent evidence in [claimant's]
claim, including opinions of treating and other examining
sources"), 416.927(c)(3) (same). Moreover, the ALJ could credit
Dr. Ostrow's opinion because he testified at the hearing and was

1  subject to cross-examination.  <u>See</u> <u>Andrews</u>, 53 F.3d at 1042

2  (greater weight may be given to nonexamining doctors who are

3  subject to cross-examination).  Any conflict in the properly

4  supported medical-opinion evidence was therefore the sole

5  province of the ALJ to resolve.  <u>See</u> <u>id.</u> at 1041.  Plaintiff is

6  not entitled to reversal on this ground.

7        B.    <u>The ALJ's Errors in Assessing Plaintiff's Credibility</u>

8              <u>Do Not Warrant Reversal</u>

9        Plaintiff argues that the ALJ failed to provide clear and

10  convincing reasons for discounting his credibility.  (J. Stip. at

11  17-20.)  Because the ALJ did provide clear and convincing reasons

12  supporting his evaluation of Plaintiff's testimony and they were

13  supported by substantial evidence in the record, reversal is not

14  warranted on this basis.

15        An ALJ's assessment of pain severity and claimant

16  credibility is entitled to "great weight."  <u>See</u> <u>Weetman v.</u>

17  <u>Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779

18  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

19  believe every allegation of disabling pain, or else disability

20  benefits would be available for the asking, a result plainly

21  contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina v. Astrue</u>, 674

22  F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and

23  citation omitted).  In evaluating a claimant's subjective symptom

24  testimony, the ALJ engages in a two-step analysis.  <u>See</u>

25  <u>Lingenfelter</u>, 504 F.3d at 1035-36.  "First, the ALJ must

26  determine whether the claimant has presented objective medical

27  evidence of an underlying impairment [that] could reasonably be

28  expected to produce the pain or other symptoms alleged."  <u>Id.</u> at

1036 (internal quotation marks omitted).  If such objective
medical evidence exists, the ALJ may not reject a claimant's
testimony "simply because there is no showing that the impairment
can reasonably produce the *degree* of symptom alleged."  Smolen,
80 F.3d at 1282 (emphasis in original).  When the ALJ finds a
claimant's subjective complaints not credible, the ALJ must make
specific findings that support the conclusion.  See Berry v.
Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative
evidence of malingering, those findings must provide "clear and
convincing" reasons for rejecting the claimant's testimony.
Lester, 81 F.3d at 834.  If the ALJ's credibility finding is
supported by substantial evidence in the record, the reviewing
court "may not engage in second-guessing."  Thomas, 278 F.3d at
959.

     In an Exertional Daily Activity Questionnaire dated December
17, 2007, Plaintiff stated that he gets tired walking short
distances, wakes up with nausea and dizziness, and has headaches;
he also claimed that the left side of his head gets "hot with
fever."  (AR 332.)  Plaintiff stated that he tried to vacuum,
dust, or do dishes when he could, but he also said that he
couldn't "do much anymore" and that when he tried to vacuum, he
would lose his balance.  (AR 332-33.)  He could walk only "a
short distance" and stand for 10 minutes.  (AR 332, 334.)  He
could lift a grocery bag once every two weeks and carry laundry
20 feet twice a week.  (AR 333.)  He said that his doctor had
told him not to drive.  (Id.)

     In a Disability Report – Appeal dated May 16, 2008,
Plaintiff stated that his slurred speech affected his

39

communication with others and that he had headaches daily and
nausea and vomiting throughout the day, memory and vision loss,
dizziness, tremors, urination problems, right-side numbness,
swelling on the left side of his head, and fatigue.  (AR 345.)
He said he could not walk far or sit or stand for "long periods
of time" and had been given a cane and a walker by his doctor and
a physical therapist.  (Id.)  He indicated that he needed help
showering and getting his medications and couldn't cook or clean.
(AR 353.)

In a Function Report dated June 2, 2008, Plaintiff wrote
that he did not do chores because he was "not able to bend" and
would "tire fast" if he tried to dust or vacuum.  (AR 377.)  He
said that he did not do house or yard work because it was "hard
to do with cane or walker."  (AR 378.)  Plaintiff said he did not
go outside alone because he had fallen on account of "TIA mini
seizures."  (Id.)  Plaintiff wrote that his conditions affected
his ability to lift, squat, bend, stand, reach, walk, sit, kneel,
talk, climb stairs, see, remember, complete tasks, concentrate,
understand, follow instructions, and use his hands.  (AR 380.)
He could walk for about 10 minutes before he had to rest for 10
to 15 minutes.  (Id.)  He said that stress made his "head hurt"
and that he used a walker and cane, which were prescribed in
October 2007.  (AR 381.)

At the September 2009 hearing, Plaintiff testified that his
low-back condition prevented him from sitting for more than 15 or
20 minutes at a time.  (AR 213.)  He said that he had suffered a
stroke that had affected his memory, peripheral vision, and
hearing.  (AR 214.)  He said that he was five feet, six inches

tall and weighed 260 pounds, whereas his average weight had been 316 pounds.  (AR 214-15.)  Plaintiff testified that his back pain stayed the same after his surgery and that he used a cane for standing and walking every day, as prescribed by Drs. Mesiwala and Reddy.  (AR 216.)  He testified that his fibromyalgia caused an "aching pain throughout the whole body" and that he usually took about a two-hour nap each day because of the pain and because his medication made him tired.  (AR 217-18.)  He said that he had TIAs three to four times a week even when taking his medication, during which he had a "seizure feeling," his body would shake, and he would "black out for a brief moment."  (AR 218.)  Plaintiff testified that he didn't do any household chores, could walk about a block and stand for only 15-20 minutes, and could carry at most the equivalent of a jug of milk. (AR 219-21.)

Reversal is not warranted based on the ALJ's alleged failure to make proper credibility findings or properly consider Plaintiff's subjective symptoms.  As an initial matter, the ALJ's RFC assessment is consistent with much of Plaintiff's testimony. For example, the ALJ accommodated Plaintiff's claim that he could lift only the equivalent of a jug of milk by limiting him to sedentary work, which requires occasionally lifting lightweight objects like files or small tools and never lifting objects that weigh more than 10 pounds.  (AR 26.)  To some extent, the ALJ also accommodated Plaintiff's complaints of difficulty walking and back pain by limiting him to, among other things, only two hours of walking in an eight-hour day, only occasionally moving his neck, never using his arms above shoulder height, never using

1  foot pedals, never working at unprotected heights, and never

2  climbing.  (<u>Id.</u>)

3       The ALJ provided clear and convincing reasons for rejecting

4  Plaintiff's subjective symptom testimony to the extent it was

5  inconsistent with the RFC assessment.[12]  (AR 26-30.)  The ALJ

6  noted that Plaintiff alleged that his "slurred speech affects

7  communication with others" (AR 30, 345) but that Plaintiff "spoke

8  clearly in both hearings in September 2009 and January 2010" (AR

9  30).  The ALJ also noted that in October 2008, Dr. Mesiwala

10 observed that Plaintiff was "alert with fluent speech." (AR 30,

11 656.)  The ALJ was entitled to rely on his personal observation

12 and conflicts with the medical evidence to discount Plaintiff's

13 testimony.  <u>See</u> <u>Orn</u>, 495 F.3d at 639 (ALJ's personal observations

14 may be used in overall evaluation of credibility but cannot form

15 "sole basis" for credibility determination); <u>Thomas</u>, 278 F.3d at

16 960 (ALJ properly relied on claimant's "demeanor at the hearing"

17 in rejecting her credibility); <u>Johnson v. Shalala</u>, 60 F.3d 1428,

18 1434 (9th Cir. 1995) (holding that "contradictions between

19 claimant's testimony and the relevant medical evidence" provided

20 clear and convincing reasons for ALJ to reject plaintiff's

21

22       [12]   Dr. Maze's finding of a "component of non-organic
   overlay in [Plaintiff's] clinical presentation" (AR 469) may be
23 evidence of malingering that would relieve the ALJ of the burden
   of providing clear and convincing reasons for discounting
24 Plaintiff's credibility.  <u>Lester</u>, 81 F.3d at 834; <u>Bagoyan</u>
   <u>Sulakhyan v. Astrue</u>, 456 F. App'x 679, 682 (9th Cir. 2011) ("When
25 there is affirmative evidence of malingering, which is present in
   this case, the ALJ is relieved of the burden of providing
26 specific, clear, and convincing reasons to discount claimant's
   testimony.").  Nevertheless, as discussed herein, the ALJ
27 provided clear and convincing reasons for not crediting
28 Plaintiff's subjective symptom testimony.

subjective symptom testimony); SSR 96-7p, 1996 WL 374186, at *5
("[T]he adjudicator may also consider his or her own recorded
observations of the individual as part of the overall evaluation
of the credibility of the individual's statements.").

The ALJ also found that Plaintiff's "longitudinal medical
history" was "not consistent with his allegation of disability."
(AR 27.)  Specifically, Plaintiff alleged that he did not go
outside alone because of "mini TIAs," but the ALJ correctly noted
that "after [Plaintiff's] hospitalization in February 2008," no
evidence showed "further hospitalization due to TIAs" or a
"sustained series of recent TIA attacks that have caused
additional dysfunction."  (AR 25, 27, 30.)  The evidence shows
that Plaintiff suffered from after-effects of his October 2007
stroke, at least for a period of time, but nothing shows that any
alleged subsequent TIA "seizures" had similar effects.  After
February 2008, Drs. Reddy's and Olivares's treatment notes
occasionally noted that Plaintiff suffered from TIAs, seizures,
questionable seizures, or transient cerebral ischemia, but they
never advised Plaintiff to seek emergency treatment or recorded
any lasting results of those reported events.  (AR 150-51, 502-
03, 725, 727.)  Drs. Reddy and Olivares recommended only that
Plaintiff see a neurologist, which apparently he never did.  (AR
158, 725.)  Moreover, after Plaintiff's February 2008
hospitalization, two brain CTs were normal (AR 130, 839), and by
May 2009, Dr. Mesiwala noted that Plaintiff had normal strength
and grossly intact sensation and motor function (AR 755).  In
August 2009, moreover, physician's assistant DeVere noted that
Plaintiff had grossly intact sensation and motor function with no

1   gross motor or neurologic deficit.  (AR 887.)

2       Plaintiff also claimed that he had nausea and vomiting
3   throughout the day, but the ALJ correctly noted that none of
4   Plaintiff's treating physicians had noted those symptoms.  (AR
5   30.)  Elsewhere in his opinion, moreover, the ALJ noted that
6   Plaintiff's fibromyalgia diagnosis was not "well documented"
7   because he "was not evaluated by a rheumatologist and no
8   physician indicated number of tender points to confirm the
9   diagnosis"; further, Plaintiff "stated that he experienced
10  depression" but "was never treated by a specialist nor was he
11  hospitalized due to psychiatric problems."[13]  (AR 25.)  The ALJ
12  permissibly relied upon a lack of medical evidence as one factor
13  in his credibility evaluation.  See Carmickle, 533 F.3d at 1161
14  ("Contradiction with the medical record is a sufficient basis for
15  rejecting the claimant's subjective testimony."); Lingenfelter,
16  504 F.3d at 1040 (in determining credibility, ALJ may consider
17  "whether the alleged symptoms are consistent with the medical
18  evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)
19  ("Although lack of medical evidence cannot form the sole basis
20  for discounting pain testimony, it is a factor that the ALJ can
21  consider in his credibility analysis."); Kennelly v. Astrue, 313
22  F. App'x 977, 979 (9th Cir. 2009) (same).  Indeed, that reason is
23  particularly persuasive here, because a lack of supporting
24  medical evidence persisted even though the ALJ continued the
25  hearing to allow for the submission of additional medical

26

27      [13]    The ALJ therefore found that Plaintiff's fibromyalgia
28  and depression were nonsevere.  (AR 25.)  Plaintiff does not
    challenge those determinations.

44

1   records.  (See AR 221-24, 230.)

2       Some of the ALJ's reasons for discounting Plaintiff's
3   credibility, however, may not be legally sufficient.  First, the
4   ALJ found that in the May 2008 disability report, Plaintiff had
5   "complained of weakness and numbness in his right side of the
6   body" but that the record showed "no neurologic deficits in terms
7   of strength and sensation."  (AR 30.)  But the portion of the
8   record cited by the ALJ, Dr. Mesiwala's October 7, 2008 note,
9   actually stated that Plaintiff had "no new neurological deficits,
10  in terms of the lower extremity strength and sensation."  (AR 656
11  (emphasis added).)  Dr. Mesiwala's previous note, in May 2008,
12  stated that Plaintiff had decreased sensation and 4+/5 strength
13  on the right and 5/5 strength on the left, which he attributed to
14  Plaintiff's October 2007 stroke.  (AR 110-11.)  Thus, Dr.
15  Mesiwala's subsequent finding of no "new" neurological deficits
16  does not support the ALJ's conclusion that Plaintiff's asserted
17  symptoms conflicted with the medical records.  Although Dr.
18  Mesiwala later found that Plaintiff had normal strength and
19  grossly intact sensation and motor function (AR 755), other,
20  earlier records supported Plaintiff's claim of right-side
21  weakness (see, e.g., AR 110, 157, 445, 469, 658).

22      The ALJ also discounted Plaintiff's credibility because
23  Plaintiff claimed that "he does not perform any of the household
24  chores due to inability to bend" but "also stated he vacuums."
25  (AR 29-30.)  In the function report cited by the ALJ, however,
26  Plaintiff stated that he did not do chores but also wrote, on the
27  same page, "I have tried to dust, vacuum but I tire fast."  (AR
28  377.)  Plaintiff's statement that he had "tried" to vacuum,

45

1  apparently unsuccessfully, was not inconsistent with his asserted
2  inability to perform chores.

3      Finally, the ALJ discounted Plaintiff's credibility because
4  he claimed to use a cane and walker that were prescribed in
5  October 2007 (AR 30, 381), but the record was "devoid of actual
6  prescription of a cane or a walker" and Plaintiff was noted to be
7  ambulating without assistance when he was discharged from the
8  hospital in October 2007 (AR 30, 424).  Indeed, it appears that
9  no medical professional advised Plaintiff to use an assistive
10 device until September 2008, when a physical therapist noted that
11 Plaintiff would be using a walker while recovering from back
12 surgery.  (AR 731, 803.)  Although the ALJ correctly found that
13 no prescription appeared in the record and that Plaintiff was
14 apparently not using a cane in October 2007, as he claimed, Drs.
15 Mesiwala and Olivares both later stated that Plaintiff needed to
16 use an assistive device to walk, at least intermittently (AR 553,
17 934, 936), and the record reflects that Plaintiff was using
18 assistive devices at his medical appointments (AR 111, 469).
19 Because Plaintiff's use of an assistive device is documented in
20 the record, at least as of late 2008, the fact that it does not
21 contain an actual prescription may not be a clear and convincing
22 reason for discounting Plaintiff's credibility, although
23 Plaintiff was apparently wrong about when he started using one.
24 Compare Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999)
25 (ALJ properly discounted credibility when claimant "walked slowly
26 and used a cane at the hearing" even though no doctors indicated
27 he used or needed assistive device and two doctors noted he did
28 not need one).

1    Although the ALJ's errors are troubling, the Court concludes
2  that they were harmless because the ALJ provided other valid
3  bases for his credibility determination.  <u>See</u> <u>Bray v. Comm'r of</u>
4  <u>Soc. Sec. Admin.</u>, 554 F.3d 1219, 1227 (9th Cir. 2009); <u>Carmickle</u>,
5  533 F.3d at 1162.  The ALJ permissibly discounted Plaintiff's
6  credibility because his complaints of "slurred speech" conflicted
7  with his presentation at the hearing and the medical evidence and
8  because Plaintiff's subjective symptom complaints were not
9  supported by the medical evidence.  Because the ALJ's credibility
10 finding is supported by substantial evidence, the Court "may not
11 engage in second-guessing."  <u>Thomas</u>, 278 F.3d at 959 (citation
12 omitted).  Plaintiff is not entitled to reversal on this claim.
13 **VII. CONCLUSION**
14   Consistent with the foregoing, and pursuant to sentence four
15 of 42 U.S.C. § 405(g),[14] IT IS ORDERED that judgment be entered
16 AFFIRMING the decision of the Commissioner and dismissing this
17 action with prejudice.  IT IS FURTHER ORDERED that the Clerk
18 serve copies of this Order and the Judgment on counsel for both
19 parties.

22 DATED: February 26, 2013          _____
23                                   JEAN ROSENBLUTH
                                     U.S. Magistrate Judge

26   [14]    This sentence provides: "The [district] court shall
27 have power to enter, upon the pleadings and transcript of the
   record, a judgment affirming, modifying, or reversing the
28 decision of the Commissioner of Social Security, with or without
   remanding the cause for a rehearing."